UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CATHERINE LOCKINGER,

                    *Plaintiff*,

     -against-

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                    *Defendant*.
------------------------------------------------------------------X

**Docket No.:**

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff Catherine Lockinger, as and for her Complaint, all upon information and belief, respectfully alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §1332, in that Plaintiff's claims exceed the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states, as Plaintiff is a citizen of Washington, D.C. and Defendant is a resident of New York State.

2.     Venue is proper under 28 U.S.C. §1391(b) because the events underlying this action occurred while Plaintiff was employed within the Southern District of New York, in the County of New York, and because Defendant does business within this District.

## IDENTITY OF THE PARTIES

3.     At all relevant times mentioned herein, Plaintiff Catherine Lockinger ("Lockinger"), who is a presently a resident of Washington, D.C., was employed by Defendant International Business Machines Corporation ("IBM") in the County, City and State of New York until her constructive discharge on May 18, 2021, after she was demoted during her maternity leave and then retaliated against for protesting that discrimination.

4.     At all relevant times mentioned herein, IBM is a New York corporation licensed to and doing business in the County, City and State of New York, where Lockinger was employed.

5.     IBM was incorporated in 1911 and is a multinational technology corporation with operations in over 171 countries that produces and sells computer hardware, middleware and software, provides hosting and consulting services in areas ranging from mainframe computers to nanotechnology and is also a major research organization whose inventions include the automated teller machine, the floppy disk and the magnetic stripe card.

6.     Lockinger is a digital technology product professional with more than 10 years of experience, who has led large product teams and managed complex digital products during her career. Lockinger was hired by IBM to guide its strategy for updating and improving IBM's Content Management System and to manage the development and implementation of features and capabilities of IBM's Content Management System.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

7.     Lockinger commenced her employment with IBM in or around September 2018, as a Product Manager in the Digital Business Group, which would later be rebranded into the Digital Growth and Commerce group.

8.     At all relevant times, Lockinger was fully qualified for her position, as confirmed by the increased responsibilities and compensation she received, in addition to the positive feedback provided to Lockinger regarding her performance.

**Lockinger's History Of Success At IBM**

9.     Lockinger was hired by IBM to develop and lead a team that would address a number of difficulties that existed in IBM's Content Management System ("CMS"), and Lockinger successfully did so.

10.     Lockinger earned a reputation as a strong performer, leader and problem solver and looked forward to continuing her career with IBM.

11.     In IBM's structured organization, employees are placed within "bands" that determine hierarchy and salary.

12.     Lockinger was a manager in the highest band, which was band 10, and sought to be promoted to the next level, namely the position of Director, which is part of the Executive Circle.

13.     Director positions are competitive at IBM, as there are very few Director positions available and individuals must be voted into the Executive Circle, so that employees seeking to be promoted to Director must stand out and be visible by, among other things, working on essential business, making strategic decisions with executive visibility and managing at least 12 people, who are preferably managing others in turn.

14.     Lockinger received consistently positive performance evaluations and remained on track to be a Director and was excited about her future at IBM.

**Lockinger Beings Maternity Leave In May 2020**

15.     In October 2019, Lockinger received the joyful news that she and her husband were expecting their first child, though Lockinger would subsequently learn that she was having twins.

16.     On or about November 1, 2019, Lockinger advised her direct supervisor, Vice President of Marketing Platforms Missy Foristall ("Foristall"), of her pregnancy, and Foristall responded in a congratulatory fashion and remained supportive of Lockinger.

17.     At that time, Lockinger was the Product Owner of the enterprise Content Management System, which delivered a substantial footprint of IBM.com and is considered an essential platform for enterprise business operations.

18.     In this role, Lockinger led a team of 8-10 direct reports and a larger organization of Engineers, Developers, and QA Engineers developing the platform

19.     In or around April 2020, approximately one month before Lockinger started her maternity leave, Foristall informed Lockinger that the team Lockinger led would be moved from the Digital Growth Commerce division to the Performance Marketing division at some point during Lockinger's maternity leave.

20.     During this same conversation, Foristall assured Lockinger that her position was "safe" and that Lockinger and her direct reports would be placed under the management of Director Jessica Criscione ("Criscione") in Performance Marketing, and Lockinger soon met with Criscione who confirmed that fact.

21.     Lockinger began her maternity leave on May 6, 2020 and gave birth the following day, May 7, 2020.

22.     Just days later, on May 11, 2020, Foristall informed Lockinger that she was being issued a Special Equity Award because of her exemplary performance, confirming that, when Lockinger's maternity leave began, her career and future at IBM remained on an upward trajectory.

23.     On or about May 21, 2020, IBM announced the organizational changes that Foristall had previously discussed with Lockinger, with Lockinger's team moving to the Performance Marketing division reporting to Criscione.

**Lockinger's Is Demoted Upon Her Return From Maternity Leave**

24.     Shortly before her return from maternity leave on October 1, 2020, Lockinger learned that her role as the Product Owner of the CMS had been given to someone else.

4

25.    Specifically, Lockinger spoke with Criscione on or about September 21, 2020, at which time Criscione told Lockinger that she would no longer serve as the Product Owner of enterprise CMS, telling Lockinger, **"The business couldn't wait for you."**

26.    Criscione stated that an employee named Brittany Kirkland ("Kirkland"), who did not have children, had assumed Lockinger's role as the Product Owner of enterprise CMS, though Kirkland was not nearly as qualified as Lockinger and Lockinger was asked to coach her.

27.    Criscione told Lockinger, "We need to figure out where to put you," indicating that IBM had not given any thought to what role Lockinger would hold after taking away her prior role because she took maternity leave.

28.    Criscione discriminatorily perceived that Lockinger would not be as interested in working because she had become a mother, asking Lockinger, **"So what do you want to do? Work part-time or what?"** though Lockinger did not want to nor need to work part-time, but wanted to return to her satisfying career at IBM.

29.    Ultimately, Lockinger was told that she would be a Group Product Manager for Sales Enablement tools within Performance Marketing upon her return, though it remained unclear what duties that role would entail.

30.    When Lockinger returned from maternity leave on October 1, 2020, it quickly became apparent that she was not in an equivalent role to the one she held before her maternity leave.

31.    The Group Product Manager position had not previously existed, lacked a clear mission or even a job description, and supervised Product Owners of non-essential tools and services, so that the position seemed unnecessary and vulnerable to budget cuts or reorganization.

32.     Lockinger also learned that she would no longer be reporting to Criscione, a Director, but would instead be reporting to Kelly Skaggs ("Skaggs"), a fellow band 10, who reported directly to Criscione, who in turn reported to Vice President David Bush ("Bush").

33.     The employee who assumed Lockinger's former role as Product Owner of CMS, Kirkland, reported directly to Bush, meaning that Lockinger was now two levels down in the reporting hierarchy, which was distressing to Lockinger as she was now further removed from the executive-level decisions and visibility that she would need in order to advance within IBM.

34.     Lockinger expressed her concerns to Criscione about both the viability of her position and of being layered twice.

35.     Criscione dismissed Lockinger's concerns, telling her to "hang tight" and trust her because "more change is coming and this will all make sense," which Lockinger hoped meant that these upcoming organizational changes would lead to Lockinger being given a role that was equivalent to the one she held before she went on maternity leave.

36.     When Lockinger asked if she could resume reporting directly to Criscione, as had been the plan before Lockinger's maternity leave, Criscione stated that she had a lot of direct reports and did not have the "bandwidth" for "all the paperwork" of another person.

37.     Lockinger discussed her concerns with Skaggs, who had been a peer on Lockinger's level but would now be Lockinger's supervisor, but Skaggs brushed off Lockinger's concerns and said that she was excited to have Lockinger since she was "so great," though Skaggs could not articulate Lockinger's role.

38.     Meanwhile, Lockinger's colleagues expressed surprise to Lockinger that she was not reinstated in her prior role given how successful and effective she was.

39.     Making Lockinger's demotion even more humiliating was the fact that Criscione, Skaggs and others asked Lockinger during October 2020 to coach and teach Kirkland, who assumed Lockinger's role as Product Owner.

40.     By the end of October 2020, the first month following Lockinger's return from maternity leave, Lockinger lost several of her direct reports and was only managing 2 of the 8 resources she had managed before her maternity leave, making it painfully clear that Lockinger had been demoted.

41.     In fact, one of Lockinger's direct reports complained to her that she had been demoted along with Lockinger, since the new organizational charts showed that Lockinger was on the same level as the employee's former peers.

42.     Lockinger was reduced to taking over tasks that Skaggs did not desire, such as taking over administrative management of three of Skaggs' direct reports, not because of a business reason, but because Skaggs complained that she did not have the "bandwidth" to manage so many people.

43.     The comments that Lockinger heard from her peers and managers confirmed IBM's perception that Lockinger was unable to work as effectively as she had because she was now a mother and a mother of twins, which included Skaggs saying, **"I know you have a lot going on at home, so I understand if this [job-related issue] might not be a priority for you,"** and another colleague stating, **"You have two babies? We need to make sure you're spending as much time with them as possible."**

44.     This discriminatory and paternalistic perception that Lockinger was unable or uninterested in continuing with her career because she had children was entirely inaccurate, as Lockinger desired to continue her career while also being a mother.

**Lockinger Searches For Another Role Within IBM**

45.     On October 29, 2020, Skaggs wrote to Lockinger on Slack, "I would like you to hang out with us [Skagg's team] for 2021, but I think the iX team in GBS might be an interesting place for your skills in the future."

46.     Skagg's statement that Lockinger could "hang out" on Skagg's team but might find interest in a different area within IBM was a clear signal to Lockinger that Lockinger's role was not essential and would likely not exist beyond 2021, and she should begin looking for a role elsewhere.

47.     Starting in or around November 2020, Lockinger began searching for other roles within IBM, hopeful that if her prior position had been taken from her because she went on maternity leave, she could move her skills elsewhere, all while still waiting for the "organizational changes" that Criscione had alluded to that would restore Lockinger's role.

48.     Although Lockinger met with various senior leaders throughout November and early December 2020, who expressed confidence in Lockinger's abilities, no opportunities materialized.

49.     Lockinger became particularly concerned following a conversation with Vice President Ari Sheinkin, who told Lockinger that the Performance Marketing Department was not a product development organization, and since Lockinger was a Product Manager and had built her career in product management, she knew that the position she had been placed in after her maternity leave had no growth opportunities and would eventually become obsolete.

50.     Lockinger also became aware that individuals who technically reported to her were taking directives from Skaggs, so that Lockinger's role was in fact already superfluous, and one

of Lockinger's direct reports even stated that Skaggs should fully step away because it was "confusing and unclear" from whom to take direction.

51.     While Lockinger was diminished because she took maternity leave, she saw a male peer named Jason Andrews ("Andrews"), who was also a band 10 and also had a child in 2020, was promoted to Vice President in Performance Marketing.

52.     Andrews had told Lockinger that he had not taken parental leave so that he could be promoted, which was not an option for Lockinger as a woman, confirming that Lockinger was disadvantaged because of her gender.

**Lockinger Protests Her Discriminatory Demotion
In Her Self-Evaluation And Is Retaliated Against**

53.     On or about December 2, 2020, Lockinger met with Skaggs, at which time Skaggs shared the ratings that she was planning on giving Lockinger in her performance evaluation.

54.     Lockinger had received nothing but positive feedback, as well as a Special Equity Award based on her performance in May 2020, so she reasonably expected positive marks from Skaggs, who had only been her supervisor for approximately two months.

55.     Skaggs confirmed that Lockinger would receive positive marks and showed her a spreadsheet where Lockinger received ratings that were primarily "Exceeds," and even jokingly stated that she was struggling to determine which area of Lockinger's performance would receive a lower rating of "Expects More," since performance evaluations at IBM customarily did not contain all "Exceeds" ratings.

56.     When Lockinger prepared her own personal assessment of her 2020 performance in December 2020, Lockinger noted the concerns that she had previously stated verbally about her role being diminished following her return from maternity leave, writing:

During my parental leave, I was removed from my role as a Product Manager of an essential enterprise product. Following the reorganization of my team and upon my return from parental leave, I was placed in a new role that did not previously exist. In this new role, I have fewer direct reports who each work towards a different mission. I do not own a budget and I am not directly responsible for determining the expectations or responsibilities of my team, which impacts my ability to deploy resources towards the advancement of tangible goals in my new role.

57.     Lockinger's protests of her diminished role following her maternity leave was a protected activity under the New York City Human Rights law.

58.     About two weeks later, on or about December 16, 2020, Lockinger saw that Skaggs had changed Lockinger's job code from "Offering Manager" to "Performance Marketing Professional," which removed Lockinger from consideration for a number of job opportunities and also limited her salary potential, as band levels in the Performance Marketing category were associated with lower salary than band levels within the Offering Manager category.

59.     Additionally, in or around January 2021, Skaggs stopped including Lockinger in meetings with senior leadership, and when an initiative that remained within Lockinger's group was presented to senior leadership at an all-hands meeting, Skaggs presented that topic.

60.     Skaggs would ask Lockinger to prepare slides for her to present to senior leadership, but completely sidelined Lockinger in presentations, including a time when Skaggs presented an initiative within Lockinger's group to senior leadership and Lockinger was not invited to attend.

61.     Soon thereafter, still in January 2021 and during the first meeting Skaggs had with Lockinger since Lockinger provided her self-evaluation protesting her demotion, Skaggs showed Lockinger the final ratings for her performance evaluation.

62.     The ratings that Skaggs presented were drastically different from what she had presented in December 2020, with Lockinger receiving *not one* "Exceeds" rating and *two* ratings of "Expects More."

63.     It was common knowledge at IBM that if an employee's performance review did not include at least one "Exceeds" rating, that employee was placed on a list of candidates to be laid off.

64.     Skaggs' ratings were clearly retaliatory, as Skaggs' summary of Lockinger's performance focused on the first half of 2020 when Skaggs was not even Lockinger's supervisor, in a clear effort to fabricate a non-existent history of poor performance.

65.     Soon thereafter, on or about January 27, 2021, Lockinger met with Criscione and expressed her concerns that her role was not equivalent to what she held before her maternity leave.

66.     Criscione responded with hostility and referenced Lockinger's self-summary, stating that she was appalled that Lockinger would write that a reduction of responsibilities and resources deterred her from being successful, and that Lockinger should have "created" a role for herself, even though it was Criscione who had told Lockinger to "hang tight" until further organizational changes were made.

67.     When Lockinger asked Criscione about those organizational changes, Criscione – again – told Lockinger that changes were coming and she should wait.

68.     Criscione's anger at Lockinger's self-summary made it clear that the negative evaluation was retaliation for Lockinger daring to put her concerns of pregnancy discrimination in writing.

**Lockinger Complains About Pregnancy Discrimination**
**And Retaliation, Yet IBM Does Nothing In Response**

69.     On or about January 27, 2021, the same day that Criscione had essentially admitted that Lockinger's negative evaluation was motivated by her complaint, Lockinger submitted a written complaint of discrimination and retaliation to IBM's Human Resources Department.

70.     Thereafter, Lockinger was in contact with Roberto Trejos Matamoros ("Matamoros") of IBM's Human Resources Department, who was based in Latin America.

71.     Matamoros initially told Lockinger that there was no violation of IBM's policy because she had been out for more than 12 weeks.

72.     When Lockinger pointed out that IBM's handbook allowed for the 20 weeks of leave that Lockinger took, in addition to laws that granted Lockinger leave, Matamoros responded that the policy was "subject to interpretation," which really meant that IBM would contort the policy however it needed to in order to avoid taking action to respond to Lockinger's complaint.

73.     On February 25, 2021, Lockinger received an email from Matamoros entitled "Closing note," which essentially dismissed and ignored Lockinger's complaint and excused IBM's discriminatory and retaliatory conduct.

74.     Matamoros' email stated that Lockinger should bring her concerns regarding the diminution of her job responsibilities following her maternity leave and her retaliatory negative performance evaluation to her direct line manager, which was Skaggs, meaning that *Matamoros told Lockinger to complain to the exact person about whom Lockinger was complaining.*

75.     Matamoros also concluded that there had been no violation of IBM's parental leave policy because Lockinger was technically still a band 10 and that, "This by definition is not a demotion," ignoring that Lockinger's responsibilities had been gutted and that she was in a far less substantial role than she had been prior to her maternity leave.

12

76.     Human Resources had elected not to assist Lockinger, and instead to support and acquiesce to the discrimination and retaliation Lockinger was enduring.

77.     Lockinger retained counsel who sent IBM a letter on March 5, 2021, and Lockinger's attorney was thereafter in communication with counsel for IBM, which was further protected activity under the New York City Human Rights Law.

**IBM Creates A Pretext**

78.     Lockinger continued to search for other opportunities within IBM, but discovered that her diminished role made her a less attractive candidate.

79.     In fact, in or around late February 2021, a hiring manager at IBM told Lockinger that she did not have enough direct reports and she was not managing complex enterprise tools to be considered for a particular position, confirming the devastating impact that IBM's gender discrimination had on Lockinger's career at IBM.

80.     In an effort to salvage her career at IBM, Lockinger arranged to speak with Vice President David Bush, who was three levels above Lockinger and supervised Criscione.

81.     To that end, Lockinger met with Bush on March 9, 2021, at which time Lockinger explained how she had been sidelined because she utilized IBM's maternity leave policy and stated that she remained fully committed to contributing to IBM.

82.     Two days later, on March 11, 2021, Bush spoke with Lockinger and also emailed her, telling Lockinger that the decisions around her work assignments had nothing to do with her being out, that "[t]he same decisions would have occurred if you were here" and that she was put on sales technology projects because of her "skills and expertise."

83.     Bush's email was a shocking change since IBM had consistently told Lockinger for the five months since her return from maternity leave that her current role was a placeholder, that

she had been removed from her role because "the business couldn't wait" and that Lockinger should "hang tight" and wait for organizational changes.

84.     Now, however, following Lockinger's complaints, Bush told Lockinger that she had been placed in her role deliberately because of her "skills and expertise," even though no one could define what it was that Lockinger was supposed to be doing.

85.     Furthermore, Bush's claim that Lockinger was assigned to sales technology projects was not true, since Skaggs had removed Lockinger from various aspects of the projects and assigned her to other portions that were already being managed by others, so that Lockinger did not have a genuine project to lead.

86.     On March 16, 2021, Lockinger responded to Bush and pointed out the falsity of IBM's shifting explanations and that they were a pretext for continued discrimination and retaliation, as she was managing a smaller team, was just barely doing band 10 work, and received a negative evaluation, all of which would affect her ability to advance within IBM.

87.     The following day, March 17, 2021, Lockinger was contacted by Nancy LaCivita ("LaCivita") of IBM's Concerns & Appeals organization, and Lockinger spoke with LaCivita about her complaints of gender discrimination and retaliation.

**It Becomes Clear That There Is No Role For Lockinger**

88.     Although Matamoros told Lockinger that Skaggs would contact her to provide clarity on her role, Skaggs did not do so, and when Lockinger raised this issue during a checkpoint meeting on March 17, 2021, Skaggs claimed she did not know anything about that, falsely claimed that IBM does not provide job descriptions, and echoed Criscione's statement that Lockinger should have found her own opportunities by now, even though the defined role she had was taken away because she went on maternity leave.

89.     Skaggs provided Lockinger with junior-level assignments that proved to be illusory and, at best, continued placeholders until some other position unexpectedly opened up.

90.     For example, in or around early March 2021, Skaggs tasked Lockinger with setting up a reporting tool, but when Lockinger began working on that project, she saw that another one of Skaggs' direct reports was already working on that same project, so that there was nothing for Lockinger to do.

91.     Skaggs then assigned Lockinger another task on or about March 23, 2021, where Lockinger would own a project, yet two other band 10s were already assigned to that project, so that Lockinger had no place or ownership on that project.

92.     When Lockinger continued to protest her lack of a role, Skaggs responded that Lockinger should plan for someone to leave the team, "in case someone retires," when Lockinger knew that the two employees who Skaggs was referring to were only in their 50s and had no plans to retire, and Skaggs was unable to provide or identify any responsibilities for Lockinger that were close to the role she performed before she took maternity leave.

93.     Thereafter, one of Lockinger's direct reports was tapped to lead a project that Skaggs had previously stated she was considering assigning to Lockinger, and for which Lockinger was qualified, confirming just how diminished Lockinger had become within IBM.

**Lockinger Continued To Protest Discrimination And Retaliation**

94.     On March 26, 2021, Lockinger emailed LaCivita of IBM's Concerns & Appeals, with whom she had not spoken to since March 17, and Lockinger advised her about her recent communications with Skaggs.

95.     Lockinger also informed LaCivita that her colleagues advised her that the person performing her former role, Kirkland, was struggling, that they could not understand why

Lockinger was demoted, that they could really use Lockinger on other projects, and that it did not make sense why they were struggling when they had someone (Lockinger) who had proven she knew how to do the work, all of which was humiliating to Lockinger, as she wanted to be viewed as a strong executive, not as someone for whom people should feel sorry.

96.  It was not until April 7, 2021, after Lockinger followed up again with LaCivita, that Lockinger finally heard back from LaCivita, with LaCivita stating that she would set up another call with her

97.  On or around April 12, 2021, Lockinger met with LaCivita, at which time LaCivita told her that there was no evidence of retaliation since Lockinger remained in the same band and had the same salary, ignoring the reality of how the terms and conditions of Lockinger's employment – and the trajectory of her entire career – had been drastically altered.

98.  LaCivita told Lockinger that this was "the end of the line for the HR investigation" and that Lockinger could look for another role if she wanted to, confirming that IBM would take no further action to address the discrimination and retaliation that Lockinger suffered.

**Lockinger Is Forced Out Of IBM**

99.  On April 13, 2021, Skaggs finally provided Lockinger with a job description, but that job description was vague and did not provide any clear objectives or purpose.

100.  When Lockinger tried to speak with Skaggs about the job description, Skaggs could not provide any genuine clarity.

101.  On April 26, 2021, Lockinger met with Skaggs and Criscione, where they cemented Lockinger's reduced role and even compared her to band 9s.

102.  Lockinger was also told that she would not receive any salary increase, which was further confirmation of how she had been sidelined and treated less well.

103.    Despite IBM's claims that Lockinger had been given a genuine role, Skaggs, in early May 2021, continued to allude to additional responsibilities and projects to which Lockinger could be assigned, which was the same "hang tight" claim that IBM had been telling her since she returned from maternity leave in October 2020.

104.    It was painfully apparent that Lockinger had no future left at IBM and any reasonable person in her position would have been required to remove him/herself from such a degrading environment.

105.    Accordingly, Lockinger was constructively discharged and so notified IBM on May 18, 2021.

106.    As a result of IBM's discriminatory conduct, Lockinger has been caused to suffer injuries resulting in emotional anguish and suffering, and has been humiliated, demeaned and otherwise degraded because of IBM's discriminatory conduct in violation of Lockinger's human rights, all of which impacted her well-being and the quality of her life.

107.    Here, IBM's conduct towards Lockinger shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Lockinger's rights under the New York City Human Rights Law, or that its unlawful actions against Lockinger were so reckless as to amount to a disregard of Lockinger's rights, that, in addition to all the damages inflicted upon Lockinger and in addition to all the measure of relief to which Lockinger may properly be entitled herein, IBM should also be required to pay punitive damages as punishment for its discriminatory conduct, in order to deter IBM and others similarly situated from engaging in such conduct in the future.

**AS FOR A FIRST CAUSE OF ACTION ON BEHALF OF LOCKINGER
AGAINST IBM FOR GENDER DISCRIMINATION IN VIOLATION
OF §8-107(1)(a) OF THE NEW YORK CITY HUMAN RIGHTS LAW**

108.    Lockinger repeats, re-alleges and incorporates in full paragraphs 1 through 107 of this Complaint as though fully set forth at length herein.

109.    At the time that Lockinger was subjected to the discriminatory conduct described herein, she was in a protected class under the New York City Human Rights Law because of her gender, pregnancy and motherhood status.

110.    Throughout the time of her employment with IBM, Lockinger was fully qualified for her position and was in a position to continue working in that capacity.

111.    IBM treated Lockinger less well because of her gender, pregnancy and motherhood status, as confirmed by the fact that IBM removed Lockinger from her role because of her maternity leave and failed to provide her with an equivalent role, and ultimately constructively discharged her.

112.    Given the circumstances that exist here, including that Criscione told Lockinger that her position was taken away because **"The business couldn't wait"** during Lockinger's maternity leave, that Criscione asked Lockinger upon her return if she wanted to work "part-time," as well as the shifting and false explanations offered by IBM, there is a very real inference that IBM's actions toward Lockinger were motivated by pregnancy and gender discrimination.

113.    Further supporting this inference, is the fact that the role that Lockinger previously had with IBM was given to another less qualified employee, who did not have children, during Lockinger's maternity leave.

114.    The aforementioned acts of IBM constitute unlawful pregnancy discrimination against Lockinger in violation of Chapter I, Title 8 of the Administrative Code of the City of New

York, §8-107(1)(a) (referred to herein as "The New York City Human Rights Law"), which provides, *inter alia* that:

> It shall be unlawful discriminatory practice . . .[f]or an employer or an employee or agent thereof, because of the gender . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

115.   As a result of IBM's violations of the New York City Human Rights Law §8-107(1)(a), IBM is liable to Lockinger pursuant §8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-502(f) of the statute for "costs and reasonable attorney's fees," as provided for under the law.

36.   As a result of IBM's discriminatory and retaliatory conduct, Lockinger has suffered actual and prospective financial loss, which Lockinger alleges to be in the amount of Two Million Dollars ($2,000,000).

37.   Here, IBM's conduct toward Lockinger shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Lockinger's rights under the New York City Human Rights Law, or that its unlawful actions against Lockinger were so reckless as to amount to a disregard of Lockinger's rights, so that in addition to the actual and prospective financial loss suffered by Lockinger, IBM should also be required to pay punitive damages as punishment for its reprehensible conduct in the further amount of Three Million Dollars ($3,000,000) in order to deter IBM and others similarly situated from such conduct in the future.

38.   Lockinger, therefore, seeks judgment against IBM in the amount of Five Million ($5,000,000) Dollars, plus costs, pre-judgment interest and reasonable attorney's fees on this Cause of Action.

**AS FOR A SECOND CAUSE OF ACTION ON BEHALF OF
LOCKINGER AGAINST IBM FOR RETALIATION IN VIOLATION
OF §8-107(7) OF THE NEW YORK CITY HUMAN RIGHTS LAW**

116.   Lockinger repeats, re-alleges and incorporates in full paragraphs 1 through 115 of this Complaint as though fully set forth at length herein.

117.   Each time that Lockinger protested discrimination in her workplace, she was engaged in a protected activity under the New York City Human Rights Law of which IBM was aware.

118.   As a proximate result of Lockinger engaging in protected activities under the New York City Human Rights Law, Lockinger suffered adverse employment action, including an intentionally lowered performance evaluation, a failure to raise compensation, and a hostile environment, all of which culminated in her constructive discharge on May 17, 2021.

119.   The circumstances in this case, including the close temporal proximity and the fact that Criscione told Lockinger that her negative performance evaluation was based on Lockinger's written protest in her self-summary of her reduced role following her maternity leave, as well as IBM's shifting and inconsistent explanations for its actions towards Lockinger, demonstrates that IBM's actions were motivated, at least in part, by her complaints of discrimination.

120.   The aforementioned acts of IBM constitute unlawful retaliation against Lockinger in violation of §8-107(7) of the New York City Human Rights Law, which provides, inter alia, that:

> It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . .

121.   As a result of IBM's violations of the New York City Human Rights Law §8-107(7), IBM is liable to Lockinger pursuant §8-502(a) of said statute for "damages, including

punitive damages," and pursuant to §8-502(f) of the statute for "costs and reasonable attorney's fees," as provided for under the law.

122.    Lockinger has been caused to suffer injuries resulting in financial loss, emotional anguish and suffering, and has been humiliated, demeaned and otherwise degraded because of IBM's outrageous conduct in violation of Lockinger's human rights, all of which has impacted her emotional and physical well-being and the quality of her life.

123.    As a direct and proximate result of IBM's retaliatory conduct complained of herein, Lockinger has suffered damages, injuries and losses, both actual and prospective, which include the loss of her job and the emotional pain and suffering she has been caused to suffer and continues to suffer, which has impacted her physical well-being, all of which Lockinger alleges to be in the amount of Two Million Dollars ($2,000,000)

124.    Here, IBM's conduct towards Lockinger shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Lockinger's rights under the New York City Human Rights Law, or that its unlawful actions against Lockinger were so reckless as to amount to a disregard of Lockinger's rights, so that in addition to all the damages inflicted upon Lockinger and in addition to all the measures of relief to which Lockinger may properly be entitled herein, IBM should additionally be required to pay punitive damages as punishment for its discriminatory conduct in the further amount of Three Million Dollars ($3,000,000), in order to deter it and others similarly situated from engaging in such conduct in the future.

125.    Lockinger, therefore, seeks judgment against IBM on this Second Cause of Action, including, among other things, for compensatory damages in the sum of Two Million Dollars ($2,000,000), and the additional further sum of Three Million Dollars ($3,000,000) in punitive

damages, together with costs, pre-judgment interest and reasonable attorney's fees on this Cause of Action, making a total claim of Five Million Dollars ($5,000,000).

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiff Catherine Lockinger demands judgment against Defendant International Business Machines Corporation, on the First and Second Causes of Action, the sum of Two Million Dollars ($2,000,000) in compensatory damages and the further and additional sum of Three Million Dollars ($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000); plus, on each Cause of Action, attorney's fees, pre-judgment interest and the costs of this action as is permitted under the law; and for such other and further relief that the Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
      BRIAN HELLER
      DAVIDA S. PERRY
      3 Park Avenue, Suite 2700
      New York, NY 10016
      (212) 889-6565